FILED

03/07/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 4, 2025

## STATE OF TENNESSEE v. DAVARIOUS MONTRAL TAYLOR

**Appeal from the Circuit Court for Tipton County**
**No. 10734    A. Blake Neill, Judge**

_____

### No. W2024-00560-CCA-R3-CD

_____

The defendant, Davarious Montral Taylor, was convicted by a Tipton County Circuit Court jury of second-degree murder and sentenced to twenty-five years in the Tennessee Department of Correction.  On appeal, the defendant challenges the sufficiency of the convicting evidence and the sentence imposed by the trial court.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Davarious Montral Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Hornsby, Assistant Attorney General; Mark Davidson, District Attorney General; and Jason R. Poyner, Stephanie Draughon, and James Walter Freeland, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

The defendant was indicted for first-degree murder and employing a firearm during the commission of a dangerous felony[1] as a result of his shooting the driver of a vehicle

---

[1] Before trial, the State moved to amend the indictment to clarify that first-degree murder was "not an applicable dangerous felony," so the second count would "only apply if [the defendant was] found guilty of a lesser included crime that is an applicable dangerous felony."  The record shows that the jury did not

outside the Broadmeadow Apartments in Covington on March 11, 2021. The State's proof at trial showed that the defendant approached a vehicle occupied by the victim, Andrew Terry, knocked on the window, and then shot into the vehicle four times. The evidence suggested that the motive for the defendant's actions was that the defendant learned the victim had assaulted a close friend earlier that evening.

Kaylnn Hendrix, the victim's girlfriend and mother of his unborn child, saw the victim several times throughout the day of March 11, 2021. Around 10:00 p.m., the victim picked up Ms. Hendrix, and they drove to the Broadmeadow Apartments to return the cell phone of the victim's brother, Jamarius Terry to him. They parked in front of one of the buildings, and Jamarius[2] came to the car, got the phone, and headed back inside. The victim started to back out from where he was parked, but a "black figure" ran up to the car and started beating on the driver's side window "with something" that "wasn't with a hand."

Ms. Hendrix heard the "person beating on the window" saying something, but she could not make out the words. Ms. Hendrix then heard the victim say, "something about his gun going for his gun," which the victim kept in the center console. As the victim was reaching for his gun, the other individual began firing into the car. Ms. Hendrix heard four gunshots, ducked, and felt the car roll forward. According to Ms. Hendrix, the victim retrieved his gun but did not fire any shots because the other individual shot first. The victim was shot three times.

After the shooting, the victim's car crashed into several nearby cars. Ms. Hendrix, who was sitting in the front passenger seat, was in a panic. She "squeeze[d]" herself out of the passenger door and went around to the driver's side "to turn the car off, because [the victim] was still driving into the other cars." The victim was "gasping for his breath" and "had globs of blood coming out of his nose." Ms. Hendrix yelled for help and called the police. The victim was transported by ambulance to the hospital where he died of "a gunshot wound to the head and chest."

Martavis Bland and Trevon White were home cooking pizza that evening when they decided to walk to a friend's home at the Broadmeadow Apartments. While walking, they encountered the defendant, and the three men walked to the Broadmeadow Apartments together. According to Mr. Bland, the defendant told them that "Little D," Sheldrion Somerville, had "got jumped" and that the defendant was "going over there to try to talk"

consider the firearm charge after finding the defendant guilty of second-degree murder, and the judgment indicates that the count was dismissed.

[2]Because the victim and the victim's brother have the same surname, we will refer to the victim's brother by first name only at times to avoid confusion. No disrespect is intended by this practice.

- 2 -

to someone named Drew. Mr. White did not recall any specifics about their conversation and did not think the defendant said who he was going to see or what he was going to do.

As the three men walked into the apartment complex, Mr. Bland and Mr. White fell behind the defendant because they "weren't all going to the same place." The defendant ran up to a car that was "pulling off" and began shooting. Mr. Bland immediately thought that he wanted to "[g]et away from there," explaining he had been expecting the defendant to have a conversation at the car, not to begin shooting. Similarly, Mr. White immediately ran from the area. Neither man had seen the defendant with a gun while they were walking. Mr. Bland acknowledged that he told officers that night that the defendant approached the car and said, "[Y]ou better not move this car or I'll put a whistle call on," and then started shooting. Mr. Bland denied being able to remember the specifics of his conversation with police but agreed that what he said in his statement was correct. Mr. White maintained that he did not hear what the defendant said at the car because he "was a good distance" away. However, when questioned about whether he told the police that he heard the defendant tell the driver of the car not to pull off and then started shooting, Mr. White stated that he did not remember doing so but did not disagree that he could have, or did tell them that.

Sergeant Sarah Maclin[3] with the Covington Police Department began her shift around 10:00 p.m. on March 11, 2021, and went to relieve another sergeant at a crime scene on Zion Street. Sergeant Maclin arrived around 10:07 p.m. and stayed for approximately 15-20 minutes. The alleged victim, Sheldrion Somerville, had apparently been assaulted, but "he was not trying to give us a statement on the assault" and "did not want to be a victim." Sometime after Sergeant Maclin arrived, the defendant "walked on the scene."

Sergeant Maclin left the scene on Zion Street and was patrolling the area when she received a shots fired call at the Broadmeadow Apartments. Because she was in the area, Sergeant Maclin actually heard the shots and was en route to the location before the call came through dispatch at 10:50 p.m. Sergeant Maclin entered the apartment complex via the rear entrance. As she drove towards the front, Sergeant Maclin saw two individuals walking calmly towards the back entrance. She shined her spotlight on the individuals and recognized one as Martavis Bland. Observing no alarming behavior, Sergeant Maclin continued driving in the direction of the front entrance, eventually encountering a dark-colored "car that was wrecked and crashed into multiple other cars in the parking lot[.]" People were "yelling and screaming," so Sergeant Maclin parked her vehicle and assessed the situation. Ms. Hendrix and Jamarius Terry were near the driver's side of the wrecked car, "screaming that he needs help." Sergeant Maclin saw the victim in the driver's seat of the car, "leaned back," with a bullet wound in his chest. Ms. Hendrix advised that the victim was still breathing, but Sergeant Maclin "could not see any chest movement going

---

[3]At the time of trial, Sergeant Maclin's last name was Dillingham, and she had been promoted to lieutenant.

up and down." Sergeant Maclin also checked for a pulse but could not determine if the victim had one. At that point, Sergeant Maclin's backup arrived and began to secure and process the scene. Medical personnel also arrived and took over assessment of the victim.

Sergeant Maclin found a gun on the driver's side floorboard, near the victim's feet, so she removed it for safety purposes. The gun had thirteen bullets in the magazine and none in the chamber. Remembering that the apartment complex had active cameras it allowed police to access, Sergeant Maclin obtained the surveillance footage and rewound it from when she arrived at the scene to see if it captured the shooting. The video showed Mr. Bland, Mr. White, and the defendant entering the complex on foot. Sergeant Maclin immediately noticed that the defendant, who she did not know at the time, was wearing "noticeable" royal blue shoes with a reflective tongue. Sergeant Maclin had seen the defendant wearing the same shoes earlier at the scene on Zion Street. Around two and a half minutes after the three men entered the complex, the video showed the defendant "running out of the exit[.]" Less than a minute later, Mr. Bland and Mr. White walked out as Sergeant Maclin drove in.

Another camera angle, with the victim's car in view, showed Jamarius Terry walk out of a building, get into the victim's car, and then exit the car and walk back towards the building. The victim's car started reversing to leave, and the defendant ran toward the car and began shooting. The defendant was then seen running away. The victim wrecked his car into several parked vehicles, and Ms. Hendrix got out of the passenger side and ran around the car to help the victim. Jamarius Terry ran back out of the building to help, and Sergeant Maclin arrived soon thereafter.

Detective Tony Doss with the Covington Police Department arrived at the scene at the Broadmeadow Apartments between 11:00 p.m. and midnight. When he arrived, the scene was "already contained . . . pretty well," and the victim had been taken for medical treatment. Officers collected a 9mm Smith & Wesson firearm, four 9mm spent shell casings, ammunition, two small bags of marijuana, blood-stained clothes, and $98.12. The victim's wallet with ID and debit card, keys, and cell phone were also collected. The shell casings were on the pavement in the parking lot, along with shattered glass from the victim's car window, and none of the casings matched the ammunition from the gun found inside the victim's car. Based on that evidence, Detective Doss determined that the victim's gun was never fired.

Detective Doss interviewed Mr. Bland and Mr. White that night and developed the defendant as a suspect. Detective Doss explained that the term "whistle call" means "a gun." Detective Doss obtained warrants to search the defendant's mother's and grandmother's homes, as well as spoke to the defendant's father in Arkansas. Based on the evidence gathered, Detective Doss obtained an arrest warrant for the defendant but

ultimately needed help from the U.S. Marshals to locate him. The defendant was taken into custody about two months later on May 17, 2021.

During the investigation, Detective Doss obtained search warrants for the defendant's social media accounts and cell phone records. Specifically, Detective Doss searched the defendant's Snapchat account after finding a Snapchat conversation between the victim and "a name listed as All Mighty Va-va," who Detective Doss identified as the defendant. At 11:13 p.m. on March 11, 2021, the defendant sent the victim a message that said, "Hey, bruh, you know what come behind TS you just pulled, right?" Detective Doss interpreted "TS" to mean "the shit."

Testifying on his own behalf, the defendant admitted that he shot the victim but claimed he acted in self-defense. The defendant explained that his friend Sheldrion Somerville called or texted him saying that "a black car just pulled up on him and pistol whipped him. Beat him up or something," and the defendant went to Mr. Somerville's house "to check up on him." Based on what he learned from Mr. Somerville, the defendant "wanted to get in contact" with the victim and Jamarius Terry.

The defendant left Mr. Somerville's house, went home to put on extra clothing and get his gun, and then messaged the victim and Jamarius to ask where they were. The defendant admitted that he usually carried a gun with him, which was typical in his social circle, but had not taken it to Mr. Somerville's house because he knew the police would be there. When the defendant received no response to his messages to the victim and Jamarius, the defendant went to the Broadmeadow Apartments to find Jamarius, who he believed would then be able to get ahold of the victim. The defendant acknowledged that he was "angry at the situation" but denied that he intended to murder or fight with the victim. The defendant maintained that he only intended to talk to the victim and Jamarius.

When he got to the apartment complex, the defendant saw that the victim's car was about to leave, so he ran to the car and knocked on the window. The defendant denied having his gun in his hand when he approached the car, explaining it was in the front pocket of his sweatshirt albeit with a bullet in the chamber. According to the defendant, the victim looked at him and "then he reached and came up," at which point the defendant "ran back" and started firing to defend himself. The defendant denied using the term "whistle call" when trying to get the victim to stop the car or even knowing what the term meant. The defendant claimed that he only shot "to get away from the scene" and did not intend to kill the victim. The defendant did not know the victim had died until the next day.

After the shooting, the defendant threw his gun and phone into some nearby woods because he was "scared" and "panicking." The defendant also explained that although he knew the police were looking for him, he did not turn himself in because he was scared.

The defendant admitted that once he was brought in and questioned by the police, he did not tell them that the victim had pulled a gun on him because he "d[id]n't want them to try to switch [his] words around without a lawyer" present.

Following the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of second-degree murder. The trial court conducted a sentencing hearing, after which it imposed a sentence of twenty-five years served consecutively to the sentence in an unrelated case. The defendant appealed.

*Analysis*

On appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's imposition of a twenty-five-year sentence.

## I. Sufficiency

The defendant argues that the evidence is insufficient to sustain his conviction because the State failed to establish the *mens rea* of the offense based on his claim that he acted in self-defense. The State responds that there "is ample evidence" to support the defendant's conviction and that "the jury reasonably rejected [the defendant's] self-defense claim." We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000).

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). At the time of the offense, the applicable statute provided:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place

where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2). When self-defense is fairly raised by the proof, the State is required to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020).

Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational jury to find that the defendant knowingly killed the victim and reject the defendant's claim of self-defense. The security footage and testimony at trial showed that the defendant ran up to the victim's car as it was pulling away and shot into the driver's side of the car from only a few feet away. The defendant would certainly be aware that doing so could kill the victim and, thus, acted "knowingly." With regard to the defendant's claim of self-defense, the defendant relies on his own self-serving testimony that the victim raised his gun first. The defendant's testimony, however, was countered by Ms. Hendrix's testimony that the "figure" that approached the car banged on the driver's side window "with something" that "wasn't with a hand." Ms. Hendrix recalled that as the victim was reaching for his gun, the other individual began firing into the car. Mr. Bland, who was in the vicinity, told police that night that the defendant approached the victim's car and said, "[Y]ou better not move this car or I'll put a whistle call on," and then started shooting. It was explained at trial that "whistle call" meant to use a gun. The defendant's assertion that the victim was "known to be violent and was drawing a firearm" does not entitle him to relief as the defendant presented no evidence that the victim was "known to be violent" and the victim's "drawing a firearm" was disputed by other testimony. The jury heard the conflicting evidence and, within its prerogative, rejected the defendant's claim of self-defense. *Goode*, 956 S.W.2d at 527. The evidence is sufficient to sustain the defendant's conviction for second degree murder.

## II. Sentencing

The defendant argues that the trial court imposed an excessive sentence by imposing the maximum in the range without addressing any mitigating factors or assigning weight to the enhancement factors. The State responds that the trial court properly exercised its discretion in imposing a within-range sentence of twenty-five years. We agree with the State.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. §§ 40-35-113, -114, -210(b). In addition, the court must consider the defendant's potential for rehabilitation, and that "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4), (5).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length or manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the

burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court conducted a sentencing hearing, at which the victim's adoptive mother testified concerning the impact of the victim's death. The State entered the defendant's juvenile court records, under seal, as well as an affidavit of complaint from the Tipton County General Sessions Court for a burglary case that was pending at the time of the victim's murder.

The State filed a notice of enhancement factors asserting that the defendant's sentence should be enhanced based on: (1) the defendant's previous history of unwillingness to comply with the conditions of a sentence involving release in the community as supported by the defendant's Tipton County Juvenile Court records, Tennessee Code Annotated section 40-35-114(8); (2) the defendant's use of a gun in the commission of the offense, *id.* section 40-35-114(9); (3) the defendant's commission of the offense while released on bond in February 2020 Tipton County and April 2020 Obion County cases, *id.* section 40-35-114(13); and (4) the defendant's having been adjudicated to have committed criminal acts as a juvenile that would be felonies if committed by an adult as supported by the defendant's juvenile court file, *id.* section 40-35-114(16).

The defendant filed a notice of mitigating factors asserting that the court should apply in mitigation that, "although guilty of the crime, [the defendant] committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the defendant's criminal conduct." *See id.* § 40-35-113(11). At the sentencing hearing, the defendant argued that this incident "directly flows" from the earlier alleged assault incident at Mr. Somerville's home and the victim was "likewise[] armed with a weapon."

In determining the defendant's sentence, the trial court recounted the evidence received at trial and nature and characteristics of the criminal conduct involved, observing that the "jury didn't think there was any evidence . . . of self[-]defense and didn't think there was evidence of voluntary manslaughter. It seems that the main thing the jury found was that maybe he didn't premeditate it." The court noted its consideration of the statistical information provided by the Administrative Office of the Courts, the validated risk and needs assessment, and that it would have taken into account any statement the defendant wished to make on his own behalf. The court reviewed the presentence report, pointing out the defendant's two misdemeanor convictions since becoming an adult for failure to appear and theft of property. The court also observed the principles of sentencing and arguments as to sentencing alternatives, finding that confinement was necessary to protect society by restraining a defendant with a long history of criminal conduct given the defendant's juvenile record and to avoid depreciating the seriousness of the offense.

The court found that five enhancement factors applied: the defendant's history of criminal behavior, the defendant's failure to comply with the conditions of a sentence involving release in the community, the defendant's use of a firearm during the commission of the offense, the defendant's commission of the present offense while released on bail, and the defendant's having been adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult. *See* Tenn. Code Ann. § 40-35-114(1), (8), (9), (13) and (16).

The court summarized the defendant's juvenile record, noting that from 2016 to 2019 the defendant had seven burglary adjudications, seven theft adjudications, and five unlawful possession of a handgun adjudications. Then, in 2020, the defendant stole a firearm from a car and was released on bond, a condition of which prohibited him from possessing a firearm. While out on bond, the defendant committed the present murder with a firearm.

The court concluded:

Considering everything and considering all of the enhancement factors, considering the fact that [the defendant] throughout his life really beginning at the age of 14 or 15 has been in the court system, has been repeatedly told not to have firearms and yet has repeatedly continued to not only carry firearms but to steal firearms. And then in this case, the reason that the courts have told him over and over and over again not to have firearms is so that you don't use a firearm. The reason the courts have told you over and over and over again not to have a firearm so you don't use a firearm is so somebody doesn't end up dead.

Regardless of whatever happened that night, [the victim] is never coming home. And you're responsible for that . . . . And the result of that, and again, as to all of the enhancement factors, the Court is going to sentence you to 25 years, which is the maximum sentence that I can give you.

Although the trial court did not explicitly state the weight given to each enhancement factor or expressly discuss the mitigating factor raised in the defendant's notice, we reiterate that the statutory enhancement and mitigating factors are advisory only and that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d 335, 345 (Tenn. 2008); *see also Bise*, 380 S.W.3d at 706. It is clear the trial court found the maximum sentence to be appropriate in light of the vast number of applicable enhancement factors and the defendant's consistent disrespect for the law. Moreover, as to mitigation, while the

defendant filed a notice of mitigating factors before sentencing, he did not provide any specific argument about mitigation in his notice or at the hearing. The trial court was not required to surmise the defendant's argument. The burden of proving applicable mitigating factors rests upon the defendant. *State v. Moore*, 1995 WL 548786, at \*6 (Tenn. Crim. App. Sept. 18, 1995) (citation omitted). Regardless, based on his brief, we understand the defendant's claim of mitigation to relate to his assertion that he acted in self-defense, and the trial court specifically recounted the jury's lack of persuasion by such theory and the evidence supports the jury's finding. The trial court's ruling was consistent with the applicable statutes, reflected the purposes and principles of sentencing, and was supported by the proof presented. Accordingly, the trial court's sentence is presumed reasonable, and we conclude there was no abuse of discretion. The defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE